STUART, Justice.
Robert S. Dobson III, as personal representative of the estate of Carrie Vick, deceased (“the Estate”), instituted garnishment proceedings in the Mobile Circuit Court seeking to garnish a debt owed by Elmer Vick to Loyd Vick in order to satisfy a $1,250,000 judgment previously entered by that court against Loyd and in favor of the Estate. The trial court denied the Estate’s request to issue the writ of garnishment. On August 1, 2008, the Estate assigned its interest in the judgment entered against Loyd to Carrie Vick’s three surviving children — Robert S. Dob-son III, Rebecca Runnels, and Deborah Rhoene Dobson Riel — and they subsequently appealed the trial court’s order denying the Estate’s request to issue a writ of garnishment against Elmer to this Court.[1] We reverse and remand.
I.
On May 5, 2005, one day after Carrie Vick filed a petition for divorce against Loyd, seeking to dissolve their 18-year marriage, Loyd shot and killed her at their home in Chickasaw. The Estate subsequently filed a wrongful-death action against Loyd and, following a jury trial, was awarded $1,250,000 plus court costs.[2] Concurrent with that trial, the Estate added Elmer, Loyd’s son from a previous marriage, as a defendant, asserting an unjust-enrichment claim against him; the trial court ultimately entered a $20,000 judgment in favor of the Estate and against Elmer on that claim. The gravamen of that claim was that Loyd had transmitted to Elmer approximately $194,700 that rightfully had belonged to Carrie Vick and that Elmer refused to return those funds to the Estate.[3]
*471 Elmer thereafter satisfied the judgment against him, but, after Loyd failed to do so, the Estate initiated garnishment proceedings against Elmer, alleging that $170,800 Elmer had received from Loyd in March and April 2005 was an unpaid loan and was thus a debt owing to Loyd subject to garnishment.[4] Although both Elmer and Loyd had previously taken the position that Loyd loaned Elmer the $170,800 so that Elmer could construct a house in Fairhope, Elmer now alleges that the $170,800 was actually a gift and that there is accordingly no debt for the Estate to garnish. After receiving briefs on the issue and listening to the argument of counsel, the trial court, on July 11, 2008, denied the Estate’s request to issue the writ of garnishment, without stating its rationale.[5]
II.
The order issued by the trial court denying the Estate’s request to issue a writ of garnishment stated in whole:
“The court having considered the process of garnishment filed against Elmer Vick by the estate of [Carrie Vick], the answer of Elmer Vick, and the briefs and oral argument of all counsel, hereby denies the issuance of the writ of garnishment.”
Thus, even though the trial court had previously heard live testimony from the relevant witnesses while deciding the Estate’s unjust-enrichment claim against Elmer, it apparently did not rely on that testimony or hear any new testimony in deciding the garnishment issue; instead, the trial court relied solely on the parties’ filings and oral argument. “ ‘When reviewing a case in which the trial court sat without a jury and heard evidence in the form of stipulations, briefs, and the writings of the parties, this Court sits in judgment of the evidence; there is no presumption of correctness.’ ” American Res. Ins. Co. v. H & H Stephens Constr., Inc., 939 So.2d 868, 872-73 (Ala.2006) (quoting Bean Dredging, L.L.C. v. Alabama Dep’t of Revenue, 855 So.2d 513, 516 (Ala.2003), and citing Old Southern Life Ins. Co. v. Williams, 544 So.2d 941, 942 (Ala.1989), and Craig Constr. Co. v. Hendrix, 568 So.2d 752, 756 (Ala.1990)). See also Rogers Found. Repair, Inc. v. Powell, 748 So.2d 869, 871 (Ala.1999) (“The factual submission to the trial judge was entirely upon written materials — pleadings, depositions, interrogatory answers, exhibits — and not on any live testimony. When a trial judge’s ruling is not based substantially on testimony presented live to the trial judge, review of factual issues is de novo.”). This Court is therefore in the somewhat unusual position of reviewing not only the legal issues de novo, but also the facts.
III.
“In a case like this [in which the garnishee denies all indebtedness or liabili *472 ty], the burden of proof is upon the plaintiff to show a debt or liability due from the garnishee to the defendant.” Sun Ins. Co. of New Orleans v. Doster-Northington Drug Co., 164 Ala. 572, 575, 51 So. 414, 414 (1909). Dobson and Riel argue that Elmer was indebted to Loyd for the $170,800, and, in support of that argument, they cite deposition testimony of both Elmer and Loyd in which Elmer and Loyd refer to the transfer of $170,800 from Loyd to Elmer as a “loan.” Elmer, however, cites the same testimony and argues that, regardless of how he viewed the transaction and regardless of how he and Loyd characterized the transaction, Loyd’s testimony demonstrates that Loyd never intended to obligate Elmer to repay the money and that the transfer should accordingly be viewed as a gift. The relevant testimony is recounted below.
On October 20, 2005, before the Estate’s wrongful-death claim against Loyd and its unjust-enrichment claim against Elmer were tried, Elmer sat for a deposition and gave the following testimony:
“Q [Attorney for the Estate]: Mr. Vick, check number ., do you see that?
“A: Yes, sir.
“Q: Dated March 24th of ’05, on that same account number, . Do you see that?
“A: Yes, sir.
“Q: And it’s a check you wrote to yourself for $100,000?
“A: Yes, sir.
“Q: Why did you do that?
“A: It was a loan to me from Dad for me to build a new house.
“Q: Okay. Where are the papers that go along with that loan?
“A: There are no papers. It was verbal.
[[Image here]]
“Q: All right. And who owns the house?
“A: Ido.
“Q: Just in your name?
“A: Yes, sir.
“Q: And how long have you owned the property?
“A: I bought it last — not this past summer, but this past summer — no, I think we’re in fall now, though we’re not really. It was sometime in the summer of ’04. I don’t remember the exact date.
“Q: So you took money your dad loaned you that he got from the insurance proceeds on the house in Gulf Shores that got blown away with [Hurricane] Ivan and are building a house in Fairhope with it; is that where we’re going?
“[Attorney for Loyd]: Object to the form of the question.
“A: For me. Yeah.
“Q: Okay.
“A: Well, I took money out of his account. I don’t know where it came from. He told me to.
“Q: Mr. Vick, what you’re testifying to is that there are no loan documents, no written documents other than that one check concerning—
“A: No, I think you’ll find another one somewhere.
“Q: Well, I’m talking about loan papers. There are no loan papers evidencing that debt, are there?
“A: Right. No written — nothing.
“Q: Now, you’ve referred to, I think, ‘I’ll find another one somewhere.’ You’re talking about another check?
“A: Uh-huh.
“Q: What do you recall? What other check is relevant to that loan?
*473 “A: There’s another one to go with that for about $70,000.
“Q: Was it after the $100,000?
“A: Yes. You should have a copy of it somewhere.
[[Image here]]
“Q: Mr. Vick, we’ve shown you a check that you wrote on the Gulf Bank account April 26 of ’05 for $70,800.
“A: Yes, sir.
“Q: And the evidence has been that that’s the same day your dad was meeting with Fred Hardman at the bank about freezing all of his accounts. What discussion did you have with your dad about withdrawing money out of that account before he went down there and met with the banker?
“A: Well, I didn’t know anything about that freezing of accounts. He called me. We had discussed the $170,000 loan, and he told me, he said, Why don’t you go ahead and get that other money and deposit it over in your house account,’ and I did.”
On April 26, 2007, after a judgment had been entered in favor of the Estate on its wrongful-death claim against Loyd, but before a judgment was entered on the Estate’s unjust-enrichment claim against Elmer, Elmer was again deposed and gave the following testimony:
“Q [Attorney for the Estate]: Okay. You testified in your deposition, Mr. Vick, that — I think it was in April — in March and April of ’05 that you cashed a hundred thousand dollar check and a seventy thousand dollar check, and that those checks were loans from your father. Do you recall that testimony?
“A: Uh-huh.
“Q: And that’s a yes?
“A: Yes.
“Q: Okay. And that was true testimony, was it not?
“A: Yes.
“Q: And as I recall your testimony, those loans were to go toward building the house that I guess you occupy now. Is that true?
“A: Yes, sir.
“Q: Have you paid that money back?
“A: No, sir.
“Q: Is there a reason you haven’t paid the money back?
“[Objection and discussion by attorneys.]
“Q: Your testimony is you still owe the money?
“[Attorney for Elmer]: You can answer.
“A: Yes.”
On May 11, 2006, before the trial on the Estate’s wrongful-death claim against him, Loyd gave the following deposition testimony upon questioning by the Estate’s attorney:
“Q: Mr. Vick, let me ask if you’ll look right down here. March 24th, 2005, Elmer wrote a check to Elmer Vick for $100,000?
“A: Right. I remember that.
“Q: And he referenced ‘house,’ correct?
“A: Right, yes.
“Q: And that was a loan from you to Elmer for him to start building a house in Fairhope, wasn’t it?
“A: Yes.
[[Image here]]
“Q: The $70,000 that Elmer wrote to himself was also a loan from you for him to use building that same house, correct?
“A: Yes.
*474 “Q: Mr. Vick, how much money have you given Elmer over the last three years?
“[Attorney for Elmer]: Object to the form. That’s irrelevant.
“A: I haven’t given any.”
When his own attorney questioned him, Loyd testified as follows:
“Q: Okay. What did you do with the proceeds [$295,000] from the [Gulf Shores] property that you sold to [Carrie Vick’s son] Bobby Dobson?
“A: That was the money that I put into the bank. And then later, whenever all this happened, I had Elmer take it out and put it in a safety deposit box and we’ve used it up now.
“Q: Okay. Was part of the money given to Elmer Vick as a gift or a loan?
“[Attorney for the Estate]: Object to the form.
“A: No that wasn’t part of that. The money that I give to him was what came out of my apartments out there that I sold at Alabama Village [in Prichard].
“Q: Okay. Those were the apartments that you were speaking of that you invested in when you got married to [Carrie Vick]?
“[Attorney for the Estate]: Object to the form.
“A: Right.
“Q: All right. And what was the agreement that you had with Elmer Vick with regards to the money that you gave him that came out of the Alabama Village proceeds?
“A: Well, he was just running a little bit tight. He was going to build him a new house and I told him I had some money, that I had just sold them apartments, and I said you’re welcome to it, you can use it.
“Q: Okay. Was there any type of loan agreement or anything that you did with Elmer?
“A: No. He helped me so much out there in the apartments. And he come out there and worked on every one that Bobby Dobson had getting the heaters started, every one of them, not one, but every one of them, and worked on every one she had and every one I had. And nobody ever paid him a penny.
“Q: And because of that what? You agreed to give him some of the money, is that what you’re telling us?
“[Attorney for the Estate]: Object to the form.
“A: Well, no. He’s always helped me.”
Elmer’s attorney then questioned Loyd as follows:
“Q: But my point is you were giving stuff to [Carrie Vick’s daughter] Ms. Reil, some valuable services, goods and services to Ms. Reil and Mr. [Bobby] Dobson, is that correct?
“[Attorney for the Estate]: Object to the form.
“A: Right.
“Q: And the same like Elmer Vick, you felt like he was entitled to some of your money, correct?
“A: Right.
[[Image here]]
“Q: And the funds that you gave in your mind to Elmer Vick for the purchase of — the funds that you gave to Elmer Vick, the $170,000 that you have classified as a loan, that was from the sale of the Ala *475 bama Village properties, is that correct?
“[Attorney for the Estate]: Object to the form.
“A: Well, we talked about it and I told him he didn’t have to pay it back right away, said he couldn’t pay it back overnight. So I said don’t worry about it. But that came out of my apartments out of Alabama Village. I had already sold apartments three or four times before I got that $300,000 check.
“Q: Is it true that Elmer Vick did a lot of work for you back in 1979, 1980, after Hurricane Frederick?
“A: Oh, he come down there and worked day and night.
[[Image here]]
“Q: And you and Elmer Vick’s mother discussed giving money to him at that time but decided against it, is that correct?
“A: Yes.
“Q: And the reason you decided against giving it to him at that time was that you were not happy with his wife at the time, is that correct?
“A: I don’t think they were getting along just right and we just held up on it.
“Q: Okay. And coming to the present day, when you gave Mr. Elmer Vick, your son, money, the $170,000, did you ever think that he was going to pay you back?
“[Attorney for the Estate]: Object to the form.
“A: Oh, I know he would pay me back.
“Q: Did you want him to pay you back?
“A: Well, I don’t know that I did. I wasn’t concerned about it. Knowing him like I do, yes, he would have paid it.
“Q: There was no written agreement, correct? There was no written agreement that he would pay you back, right?
“A: No.
“Q: Is it fair to say that you were going to consider the money a gift to Elmer?
“[Attorney for the Estate]: Object to the form, asked and answered.
“A: Well, I put that money in the bank on them [certificates of deposit] and had him to sign it so if something happened to me that he could take over.”
Considering all of this testimony as a whole, we agree with Dobson and Riel that the $170,800 transfer from Loyd to Elmer is properly viewed as a loan, not as a gift.
In Dial v. Dial, 603 So.2d 1020, 1022 (Ala.1992), this Court stated:
“The elements of a valid gift are as follows:
“1) An intention to give and surrender title to, and dominion over, the property;
“2) Delivery of the property to the do-nee; and
“3) Acceptance by the donee.”
There is no dispute in this case that the $170,800 was delivered to and accepted by Elmer; thus, whether that money was a gift or a loan depends on Loyd’s intent at the time of the transfer, that is, whether it was Loyd’s intent and understanding that Elmer was to repay the money. See Samford v. First Alabama Bank of Montgomery, N.A., 431 So.2d 146, 150 (Ala.1983) (“To constitute a gift in this state, there must be a clear intention on the part of the donor to relinquish all present and future dominion over the property.”).
When Loyd was asked directly whether he considered the $170,800 to be a gift, his answer was nonresponsive. However, *476 when Loyd was asked earlier how much money he had “given Elmer over the last three years,” he replied by stating “I haven’t given any.” (Emphasis added.) Moreover, although Elmer has suggested in his brief to this Court that Loyd gave him the money in return for work he had done on some rental apartments, when Loyd was asked if he had given Elmer the money in return for that help, he replied, “Well, no. [Elmerj’s always helped me.” Thus, Loyd had at least three opportunities to describe the transfer as a gift, but he never did so; instead, he repeatedly agreed with the characterization of the transfer of the $170,800 as a loan.
Loyd’s testimony also reveals that he understood Elmer to have an obligation to pay him back and that he expected Elmer to fulfill that obligation. When asked directly if he thought Elmer was ever going to pay him back, Loyd stated that he “kn[e]w he would pay me back.” Elmer emphasizes that Loyd also stated that he did not know if he wanted Elmer to pay him back, but Loyd immediately explained that statement by stating that he “wasn’t concerned about it” because, “[k]nowing him like I do, yes, he would have paid it.” Moreover, Loyd’s statement that “I told [Elmer] he didn’t have to pay it back right away” necessarily implies that Loyd expected Elmer to pay him back at some point in the future — -just not “right away.” (Emphasis added.) We therefore conclude that, even in the absence of a written loan agreement or repayment plan and even though transfers from parents to their children are generally presumed to be gifts,[6] Hooks v. Hooks, 264 Ala. 66, 69, 84 So.2d 354, 357 (1955), it was Loyd’s intent and understanding that Elmer would repay the $170,800 that Loyd transferred to him in March and April 2005; therefore, that transfer of funds is, under the law, a loan.
However, even though we are making a factual finding that Elmer is indebted to Loyd for $170,800, Elmer nevertheless argues that the trial court’s judgment denying the Estate’s request to issue a writ of garnishment should be affirmed based on the doctrines of judicial estoppel and/or res judicata. He first argues that this Court should apply the doctrine of judicial estoppel to bar Dobson and Riel from asserting that the transaction between Loyd and Elmer was a loan because, he says, that theory presupposes that the $170,800 belonged to Loyd before it was loaned to Elmer; however, Elmer argues, the Estate argued during the underlying case that the same $170,800 actually belonged to Carrie Vick, not Loyd.
 The doctrine of judicial estoppel generally applies to preclude a party from assuming a position in one legal proceeding that is inconsistent with a position it has previously asserted. Ex parte First Alabama Bank, 883 So.2d 1236, 1241 (Ala.2003). For judicial estoppel to apply,
“ ‘(1) “a party’s later position must be ‘clearly inconsistent’ with its earlier position”; (2) the party must have been successful in the prior proceeding so that “judicial acceptance of an inconsistent position in a later proceeding would create ‘the perception that either the first or second court was misled’ ” (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir.1982)); and (3) the party seeking to assert an inconsistent position must “derive an unfair advantage or impose an unfair detriment *477 on the opposing party if not estopped.” [New Hampshire v. Maine, ] 532 U.S. [742] at 750-51, 121 S.Ct. 1808 [ (2001) ]. No requirement of a showing of privity or reliance appears in the foregoing statement of factors to consider in determining the applicability of the doctrine of judicial estoppel.’ ”
Middleton v. Caterpillar Indus., Inc., 979 So.2d 53, 60-61 (Ala.2007) (quoting Ex parte First Alabama Bank, 883 So.2d at 1244-45). We are not persuaded that judicial estoppel applies here because, although the Estate did assert at trial that the $194,700 it was seeking belonged to Carrie Vick as opposed to Loyd, the Estate did not prevail on that assertion. The trial court ultimately entered a judgment awarding the Estate only $20,000 of the $194,700 it sought in its claim against Elmer; thus, the trial court implicitly held that $174,700 of those funds the Estate claimed did belong to Loyd.[7] If a subsequent court were to accept the argument Dobson and Riel now advance — that Loyd loaned $170,800 to Elmer — there would be no perception that the first court was misled because the results of the two proceedings would be entirely consistent.[8] Accordingly, we decline to apply the doctrine of judicial estoppel to bar Dobson and Riel from now claiming that the $170,800 that Loyd transferred to Elmer was a loan.[9]
Elmer has also argued that the doctrine of res judicata bars the garnishment claim filed against him, while Dobson and Riel argue that the doctrine of res judicata is inapplicable in this case. In Equity Resources Management, Inc. v. Vinson, 723 So.2d 634, 636-37 (Ala.1998), this Court explained the doctrine of res judicata as follows:
“The essential elements of res judica-ta are (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both actions. If those four elements are present, then any claim that was, or that could have been, adjudicated in the prior action is barred from further litigation. Dairyland Ins. Co. v. Jackson, 566 So.2d 723, 725-26 (Ala.1990).
[[Image here]]
“This Court, in Whisman v. Alabama Power Co., 512 So.2d 78, 81 (Ala.1987), restated the elements of res judicata:
“ ‘[R]es judicata ... involves prior litigation between a plaintiff and a defendant, which is decided on the merits by a court of competent jurisdiction, and then a subsequent attempt by the prior plaintiff to relitigate the same cause of action against the same defendant, or perhaps to relitigate a *478 different claim not previously litigated but which arises out of the same evidence. Alabama law is well settled that this will not be allowed. A valid, final judgment on the merits of the claim extinguishes the claim. If the plaintiff won, the claim is merged into the judgment; if the defendant won, the plaintiff is barred from relitigat-ing any matter which could have been litigated in the prior action.’
“(Citations omitted. Emphasis in original.) This statement from Whisman is consistent with a long line of cases holding that whether the second action presents the same cause of action depends on whether the issues in the two actions are the same and on whether substantially the same evidence would support a recovery in both actions.”
The parties essentially agree that whether the doctrine of res judicata has a field of operation in this case depends upon whether the trial court was presented with the same cause of action during the garnishment proceedings as it was presented with, and decided, during the first trial. Elmer argues that the causes of action are the same because, he says, the garnishment claim is derived from “the same nucleus of operative facts” as the unjust-enrichment claim the Estate pursued against Elmer at the first trial. See Chapman Nursing Home, Inc. v. McDonald, 985 So.2d 914, 921 (Ala.2007) (stating that the doctrine of res judicata applies to “ ‘ “all legal theories and claims arising out of the same nucleus of operative facts” ’ ” and that “two causes of action are the same for res judicata purposes ‘ “when the same evidence is applicable in both actions.” ’ ” (quoting other cases; emphasis omitted)). Dobson and Riel argue that the issue whether the transfer of funds from Loyd to Elmer was a loan or a gift was not litigated during the first trial and that the doctrine of res judicata accordingly has no application. In support of their argument, Dobson and Riel cite Denniston & Co. v. Jackson, 468 So.2d 170, 172 (Ala.Civ.App.1985) (quoting Aetna Life Ins. Co. v. Martin, 108 F.2d 824, 826 (8th Cir.1940) (“‘A prior judgment between some parties, which is not strictly res judicata because based upon different causes of action, operates as an “estoppel” only as to matters actually in issue or points controverted.’ ”)).
We agree with Dobson and Riel that the cause of action presented in the first trial and that presented in the garnishment proceedings are different. In the first trial, the relevant issue was whether the $194,700 the Estate claimed rightfully belonged to Carrie Vick or to Loyd Vick. The record contains briefs on that issue filed in the trial court by both Elmer and the Estate, and those briefs reveal the “nucleus of operative facts” and evidence the parties deemed applicable in that action. Chapman Nursing Home, 985 So.2d at 921. Both parties’ briefs focus on the source of the $194,700 that the Estate claimed. Elmer, in his brief, cited facts indicating that it was Loyd that had made the down payments, monthly payments, insurance payments, and tax payments on the two properties in Gulf Shores and argues that he was accordingly entitled to all the sales proceeds from one property and the insurance proceeds from the other. In its brief however, the Estate cited facts indicating that Carrie Vick was a joint owner with the right of survivorship of both Gulf Shores properties, that she was liable for the mortgages on both properties, and that she had, with respect to the property damaged during Hurricane Ivan and for which an insurance settlement was received, contributed $20,000 toward the down payment and had contributed a significant amount toward its furnishings. Neither party’s brief addressed, directly or *479 indirectly, the issue whether the $170,800 transfer from Loyd to Elmer was a loan or a gift or discussed the facts relevant to that issue. Clearly then, the evidence related to the gift-or-loan issue was not applicable to that trial, and the operative facts were different. Accordingly, the causes of action are not the same and the doctrine of res judicata does not prevent Dobson and Riel from pursuing their attempt to garnish Elmer’s debt to Loyd.[10]
IV.
The trial court denied the Estate’s request to issue a writ of garnishment against Elmer without explaining its rationale for entering that order. However, upon conducting a de novo review of the relevant facts and law, we conclude that Elmer is indebted to Loyd in the amount of $170,800 and that Dobson and Riel, who now hold the legal interest in the $1,250,000 judgment entered in the Estate’s favor against Loyd, are not barred by the doctrines of judicial estoppel or res judicata from garnishing Elmer’s debt to help satisfy that judgment. Accordingly, the judgment entered by the trial court is hereby reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
COBB, C.J., and LYONS, BOLIN, and MURDOCK, JJ., concur.

. In their brief filed with this Court, Dobson and Riel represent that Runnels has stated that she does not wish to participate further in this appeal and that she has accordingly not joined in their brief.

. In a separate proceeding, Loyd was convicted of murder for killing Carrie and was sentenced to life imprisonment.

. In August 2004, Loyd and Carrie Vick sold one house in Gulf Shores for $295,000, and, in March 2005, they received an insurance check for $94,400 for damage to another house in Gulf Shores suffered as the result of Hurricane Ivan, which made landfall in September 2004. The Estate’s claim against Elmer for $194,700 represented one-half of those funds.

. Elmer and Loyd had a joint bank account at First Gulf Bank. On March 24, 2005, with Loyd’s permission, Elmer wrote himself a check for $100,000. On April 26, 2005, Elmer wrote himself another check for $70,800, again with Loyd’s permission. Although Elmer’s name was on this checking account, it is undisputed that he was not the source of the funds he withdrew on March 24 and April 26.

.Pursuant to § 6-6-458, Ala.Code 1975, either party could have requested that the issue be tried before a jury; however, neither the Estate nor Elmer made such a request.

. Dobson and Riel acknowledge that there is no written documentation indicating that the transfer was a loan, but they also emphasize that Elmer has presented no documentary evidence indicating that Loyd treated the transfer as a gift for tax purposes and that he paid the appropriate federal gift tax.

. In the appellate briefs filed with this Court, the parties agree that whether the transaction between Loyd and Elmer was a gift or a loan was not disputed during the initial trial.

. We further note that, although whether the transaction between Loyd and Elmer was a loan or a gift was not an issue during the initial trial, to the extent the Estate did assert a position on that question, that position appears to have been that the transaction was a loan — albeit a loan Loyd had no right to make because the funds were not his to loan. The Estate’s second amended complaint states both that "$100,000 was loaned to Elmer Vick from Loyd Vick for the purpose of constructing a home in Fairhope” and that "$70,800 was loaned to Elmer Vick from Loyd Vick for the purpose of constructing a home in Fair-hope.”

.In defending Elmer’s judicial-estoppel argument, Dobson and Riel also argue that it is Elmer who should be judicially estopped from now claiming that the $170,800 was a gift instead of a loan. However, because we have already found that the transaction between Loyd and Elmer was in fact a loan, it is not necessary to address this argument.

. Moreover, even when all the elements of res judicata are present, the doctrine serves only to bar "any claim that was, or that could have been, adjudicated in the prior action .... ” Equity Res. Mgmt., 723 So.2d at 636 (emphasis added). It would have been impossible for the Estate to adjudicate the garnishment claim during the first trial because the $1,250,000 judgment against Loyd that indebted him to the Estate was not entered until the conclusion of that trial. Before that judgment was entered and Loyd failed to satisfy it, the Estate had no basis for attempting to garnish anything belonging to Loyd.